UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CELLCO PARTNERSHIP d/b/a** ) | |
| **VERIZON WIRELESS,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **BELL ATLANTIC MOBILE OF MASSACHUSETTS** ) | |
| **CORPORATION, LTD. d/b/a VERIZON WIRELESS** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No.:** |
| ) | |
| **TOWN OF BROOKLINE, MASSACHUSETTS;** ) | |
| ) | |
| **TOWN OF BROOKLINE BOARD OF APPEALS;** ) | |
| ) | |
| **and DIANE GORDON, HARRY MILLER, BAILEY** ) | |
| **SILBERT, ENID STARR, LAWRENCE KAPLAN,** ) | |
| **MURRAY SCHOCKET in their official capacities as** ) | |
| **Members of the Town of Brookline Board of Appeals,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

### Introduction

1.      Plaintiff Cellco Partnership d/b/a Verizon Wireless ("Cellco"), provides personal

wireless services ("PWS") in Massachusetts through its affiliate, Plaintiff Bell Atlantic Mobile of

Massachusetts Corporation, Ltd. ("Bell Atlantic Mobile of Massachusetts") (collectively

"Verizon Wireless"). Verizon Wireless and its corporate predecessors have long sought to fill a

significant coverage gap in the south part of Brookline, Massachusetts, in order to provide

reliable PWS to its many customers in that area.  During this time, the Town of Brookline (the

"Town") has refused every opportunity and request by Verizon Wireless and others to lease potentially suitable Town-owned properties for a PWS facility that could help to fill this gap. At the same time, the Town has adopted and implemented a zoning scheme that, as a practical matter, has made privately owned sites equally unavailable to address the significant coverage gap, culminating in the denial of the special permit application that is the subject of this Complaint. Having seen the Town block all of Verizon Wireless' reasonable efforts to close its coverage gap, Verizon Wireless now turns to the Court for relief, and brings this action seeking declaratory and injunctive relief and damages for the Defendants' violations of the Telecommunications Act of 1996, 47 U.S.C. § 332 ("TCA") and Massachusetts law.

2.    Specifically, Verizon Wireless seeks a declaration that the Defendant Town of Brookline Board of Appeals (the "Board") violated the TCA when it denied Verizon Wireless' application for a special permit to allow the installation of a PWS facility hidden within the existing cupola of a commercial building at 183-189 Grove Street and 1006-1022 West Roxbury Parkway in Brookline (the "Property"), and within a twenty-foot high flagpole rising above that cupola. The Board denied the application for a special permit even though there is no other available and feasible location from which Verizon Wireless can provide service to fill a significant coverage gap affecting thousands of its customers in the south part of Brookline, and despite evidence at the hearing establishing that the Verizon Wireless proposal satisfied the applicable requirements of the Town of Brookline Zoning By-law ("Zoning By-law"). As a result of the Board's unlawful acts, Verizon Wireless is entitled to an order compelling the Defendants to grant Verizon Wireless a special permit allowing the construction and operation of the proposed PWS facility, and other appropriate relief.

**Jurisdiction and Venue**

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331, as Plaintiffs' claims arise under the Supremacy Clause of the U.S. Constitution and under

the laws of the United States, specifically, 47 U.S.C. § 332(c)(7), which provides that "anyone

adversely affected by any final action or failure to act by local government that is inconsistent

with the limitations [of the TCA] may seek review in any court of competent jurisdiction and the

court shall hear and decide such action on an expedited basis."

4.      This case seeks a declaratory judgment regarding Verizon Wireless' rights under

federal law, and so this Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202.

5.      This Court has supplemental jurisdiction over the state law claim asserted in this

Complaint pursuant to 28 U.S.C. § 1367, as it forms part of the same case or controversy as

Plaintiff's federal law claims.

6.      Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)

because all of the Defendants reside in this District and all events or omissions giving rise to this

action occurred within this District.

**Parties**

7.      Plaintiff Cellco is a general partnership organized under Delaware law, with its

principal place of business at 180 Washington Valley Road, Bedminster, New Jersey.

8.      Cellco operates in Brookline and surrounding areas of Massachusetts through its

wholly-owned affiliate, Plaintiff Bell Atlantic Mobile of Massachusetts. Bell Atlantic Mobile of

Massachusetts is organized under the laws of Bermuda and has its principal place of business at

180 Washington Valley Road, Bedminster New Jersey and a local office at 400 Friberg Parkway,

Westborough, Massachusetts.

3

9.    The Town is a municipal corporation existing under the laws of the Commonwealth of Massachusetts.

10.    The Board is an instrumentality of the Town of Brookline that has the authority to issue special permits for wireless communications facilities pursuant to the Zoning By-law.

11.    Defendant Diane R. Gordon is an individual who resides at 180 Ivy Street, Brookline, Massachusetts, is a member of the Board, and acted as the chair of the Board during the hearing on Verizon Wireless' application. She is being sued in her official capacity.

12.    Defendant Bailey S. Silbert is an individual who resides at 139 Rawson Road, Brookline, Massachusetts, is a member of the Board, and sat on the Board panel that heard and decided Verizon Wireless' application. He is being sued in his official capacity.

13.    Defendant Enid Starr is an individual who resides at 102 Fernwood Road, Chestnut Hill, Massachusetts, is a member of the Board and sat on the Board panel that heard and decided Verizon Wireless' application. She is being sued in her official capacity.

14.    Defendant Harry Miller is an individual who resides at 21 Regent Circle, Brookline, Massachusetts, and is a member of the Board. He is being sued in his official capacity.

15.    Defendant Lawrence E. Kaplan is an individual who resides at 10 Princeton Road, Chestnut Hill, Massachusetts, and is a member of the Board. He is being sued in his official capacity.

16.    Defendant Murray Shocket is an individual who resides in Brookline, Massachusetts, and is a member of the Board. He is being sued in his official capacity.

**Personal Wireless Services**

17.    Verizon Wireless is a PWS provider, as defined in the TCA, and is licensed through Cellco by the Federal Communications Commission ("FCC") to provide mobile radio telephone ("cellular") and PCS service to an area that includes Brookline, Massachusetts (the "Licensed Area").

18.    Cellular telephones first came into widespread use during the mid-1980s. Since that time, the use of cellular telephones and other mobile data devices using similar technology has grown exponentially. There are more than one hundred and seventy million users of mobile telephone and other wireless devices in the United States today. In addition to individual consumers and businesses, cellular telephone and data device users include government agencies and public safety providers, such as police, ambulance and fire departments, and other emergency service providers.

19.    A PWS network functions by transmitting a low power radio signal between a cellular telephone or other device and a PWS facility, commonly known as a "cell site," which consists of antennas mounted on a tower, building, or similar structure. As a caller moves out of the coverage range of one cell, the radio signal is "handed off" from the cell site in that coverage area or "cell" to the cell site of an adjacent cell to provide seamless and continuous service to a mobile customer.

20.    Engineers proposing to locate a new cell site take into account factors such as the height of the proposed antennas, topographical concerns (e.g. extensive tree cover, hilly terrain, or other features which may obstruct the transmissions between the mobile device user and the PWS facility), the geographic relationship of the proposed cell sites to other existing and proposed cell sites in the network, and customer demands for service in a particular area. It is

critical to the proper functioning of the network that each cell site be located with regard for the technical characteristics of radio frequency ("RF") signals and the requirements of the overall network design. In addition to these locational constraints based on RF needs, there are other requirements bearing on the development of a new cell site. In order for a proposed location to be one that is feasible for Verizon Wireless' use as a cell site, the owner of the property must be willing to lease it for that purpose, the site must be physically and structurally suitable for the installation of the necessary equipment, and Verizon Wireless must be able to obtain all necessary zoning and other applicable governmental approvals for the proposed installation and its use.

## The Longstanding Effort to Close Verizon Wireless' Significant Coverage Gap in South Brookline

21.    Brookline contains approximately 6.8 miles of land area, extending from the Massachusetts Turnpike at its most northeasterly point, to its southern boundary, 4 miles to the south, with the City of Newton and the West Roxbury neighborhood of Boston. Route 9, a major commuter route to Boston from the western suburbs, bisects Brookline on an east-west diagonal. The area of Brookline to the north of Route 9 is more densely populated and has more commercial development than the area to the south of that highway, which is more generally characterized by larger residential lots, considerable town and institutional property, and little commercial development.

22.    Several Verizon Wireless cell sites located in Brookline and in the surrounding cities of Boston and Newton provide coverage within parts of Brookline. Nonetheless, within a large area in the southern part of Brookline, Verizon Wireless service is unavailable. This is a significant coverage gap that encompasses more than one square mile of area within the southeastern corner of Brookline, and includes more than one mile along the heavily traveled

6

West Roxbury Parkway, which is a principal urban arterial roadway. The coverage gap area also encompasses significant segments of the heavily traveled minor arterial roadways in this area. In addition to the considerable vehicle traffic in south Brookline that cannot get a signal from a Verizon Wireless cell site, this coverage gap contains numerous residences, a popular public golf course, a private country club, and a small business district near the Francis X. Ryan Circle. Customers within or passing through this area are either unable to initiate calls, or they experience "dropped" or interrupted calls and data transmissions.

23.    The Board acknowledges the existence of this coverage gap in its decision filed with the Town Clerk on March 3, 2005 denying Verizon Wireless' special permit application ("Decision"). (Decision at p. 6.) (A true, accurate, and certified copy of the Decision is attached hereto as Exhibit A.) Other Town officials have also acknowledged this gap. At the June 22, 2004 meeting of the Board of Selectmen, Town Administrator Kelliher identified the wireless coverage gap in south Brookline. At the October 19, 2004 Board of Selectmen meeting, Deputy Town Administrator Sean Cronin noted that Town residents, as well as the Town Police and Fire Departments, schools and other Town departments "have expressed dissatisfaction with the cell coverage in South Brookline." The Town's Police Chief publicly complained during meetings of the Brookline Board of Selectmen, on July 13, 2004, and October 19, 2004, about the coverage gap and its effect on the operations of the wireless data system his department uses to communicate with laptop computers in police cruisers. The Police Department's wireless data system operates on the Verizon Wireless network.

## Early Efforts to Provide Service to South Brookline

24    Verizon Wireless and its corporate predecessors have for many years needed a site from which to provide personal wireless service to the south part of Brookline. During this

7

time, Verizon Wireless and its predecessors have investigated numerous privately-owned sites.

They have also repeatedly asked Town officials to make Town-owned property available for a

PWS facility, and have followed the efforts of other carriers and tower developers to establish

PWS facilities on Town property that might be available for collocation by Verizon Wireless. In

every case, the Town has either rejected Verizon Wireless' proposals or failed to take the steps

necessary to allow a PWS facility to be sited on Town property.

25.    In 1992, NYNEX Mobile Communications Company ("NYNEX Mobile"), a

corporate predecessor of Verizon Wireless, contacted the Town about the possibility of placing

antennas on an unused incinerator smokestack at a Municipal Transfer Station on Newton Street

in Brookline. This Town-owned  location is just over one mile to the west of the site that is the

subject of Verizon Wireless' recently-denied application, and NYNEX Mobile intended this site

to provide coverage to the same significant coverage gap that persists today. During 1992 and

1993, NYNEX Mobile representatives met with Town officials, made a presentation to the Board

of Selectmen, and participated in a public hearing conducted by the Planning Board. Ultimately,

NYNEX Mobile submitted a proposed form of lease to the Town. Although the Planning Board

recommended that the Selectmen enter into a lease with NYNEX Mobile, there was significant

opposition by local residents and the Town ultimately chose not to execute the lease.

26.    During subsequent years, Verizon Wireless and its predecessors developed five

cell sites at locations in Brookline, Newton, and the Jamaica Plain and West Roxbury

neighborhoods of Boston that provide coverage to the areas surrounding the present coverage

gap. The service provided by these surrounding sites served to narrow the coverage gap to its

present, still significant, scope. Because of the terrain and the characteristics of wireless

8

technology, however, it is not possible to fill the remaining significant coverage gap in the south part of Brookline entirely with facilities located outside that area.

27.    In 1997, the Town responded to the passage of the Federal Telecommunications Act in 1996 by imposing a moratorium on permitting wireless antennas within Brookline. The moratorium was effective from May 1997 to November 1997, at which point a section addressing wireless communications (now codified as Section 4.09) was added to the Zoning By-law.

28.    During 1999, the Town made a false start towards allowing PWS service in south Brookline. The Town issued a Request for Proposals ("RFP") for the use of the Department of Public Works ("DPW") Garage, as a site for a PWS tower. This RFP received a strong response, reflecting the keen need by carriers for service in this area. Nevertheless, no lease was ever awarded as a result of this DPW Garage RFP.

29.    Also during 1999, the Town allowed Verizon Wireless to locate a temporary cell site on the Fire Station #6 property to provide service during the Ryder Cup Golf Championship, which took place at The Country Club in September 1999. The Town similarly allowed other wireless communications companies to use the Putterham Meadows Golf Course ("Golf Course") and the DPW Garage sites for temporary cell sites during the same event. Verizon Wireless and the other carriers paid the Town for those uses, and no zoning approvals were required.

30.    Following the Ryder Cup, an article was placed on the Town Meeting warrant to allow for a permanent cell tower on the Golf Course. In discussions with the Selectmen concerning that warrant article, Town Planner Polly Selkoe opined that there was a clear need for a cell tower in that area of south Brookline. However, the Brookline Town Meeting in

9

November 1999 defeated the proposal to lease the Golf Course for PWS use. The Selectmen also rejected requests from carriers to extend their temporary operations until a permanent facility could be found. As a result, the temporary Ryder Cup cell sites were removed, and south Brookline reverted to its previous cellular-free status. A tower at the Golf Course property would have been a feasible site for Verizon Wireless to use to fill its coverage gap on a long-term basis, and Verizon Wireless would have sought to collocate on such a tower had it been constructed.

## The Continued Search for a Site to Serve South Brookline

31.    In late 1999, shortly after the Town Meeting voted to reject the proposed tower at the Golf Course, Verizon Wireless engaged Structure Consulting Group ("SCG"), a real estate consulting firm, to help Verizon Wireless find a location for a PWS facility to serve the significant coverage gap remaining in the south part of Brookline. As it customarily does when it is assigned a site search, SCG first identified and reviewed the applicable zoning restrictions on PWS siting. It immediately became clear that if the Town was not going to allow a site on Town-owned property, the Brookline Zoning By-law would impose a significant obstacle to successfully siting a PWS facility on private property within south Brookline. In particular, Section 4.09.6.a of the Zoning By-law, among other limitations, prohibits locating wireless communications antennas and facilities on or within 50 feet of any residence and also prohibits the construction of a tower in a residential district. Almost the entire coverage gap area in south Brookline is zoned for residential use. The private property siting options for this area are thus restricted to: (i) locating antennas on a building that is not itself, and is not within 50 feet of, any residence, historic site, or other use designated in Section 4.09.6.a., and is not within 200 feet of

10

a school or within 600 feet of and visible from a public conservation area; or (ii) locating a tower within a non-residential zone.

32.     Based on its review of the Brookline Zoning By-law and map, as well as its awareness of the strong public opposition to Verizon Wireless' proposed location at the Town incinerator site in the early 1990's, SCG first looked to identify a property outside of Brookline from which coverage could be provided into the coverage gap area. The best available option from that standpoint was Broadlawn Park Condominiums in West Roxbury, just across the municipal line. Unfortunately, however, Verizon Wireless' RF engineers determined that a cell site at this location and at this distance from the heart of the coverage gap area would not provide the necessary coverage.

33.     Based on that technical input, SCG turned its focus to sites that were more centrally located with respect to the coverage gap. In early 2002, SCG systematically reviewed the coverage gap area to identify buildings on which antennas might be mounted or land sites on which the construction of a new tower might be feasible and permissible. SCG first determined whether the site was feasible from the standpoint of the Town's zoning restrictions, and then explored whether there was sufficient landlord interest in leasing to make a property worthy of further pursuit. As part of that process, during January 2002, Verizon Wireless representatives contacted officials at the Dexter School and the Park School. Both of these schools are in Brookline, and both contain buildings that do not have dwelling units. Unfortunately, neither school had any interest in leasing for PWS use.

34.     As part of this site search process, SCG and Verizon Wireless also investigated Town-owned sites. State procurement law requires that, before a Town-owned site is made available for lease to a private party, the Town must issue an RFP seeking competitive responses

11

for such lease. Verizon Wireless, through SCG, made Town officials aware of its strong interest in leasing Town-owned sites in south Brookline for PWS use. It urged the Town in writing and by telephone to issue RFPs for that purpose. This contact included calls by SCG to the Town Administrator, Richard Kelliher. The Town, however, did not issue any RFP's.

35.    Among the sites SCG and Verizon Wireless investigated and pursued were the Transfer Station incinerator site (once again) and the DPW Garage site. By letter dated January 23, 2002, to Thomas DeMaio, the Brookline Commissioner of Public Works, SCG formally requested that these DPW-managed sites be made the subject of an RFP for PWS use. Of all the Town-owned sites in south Brookline, these are the only two sites not in a residential zone (both are zoned for industrial use). Therefore, they are evidently the only two Town-owned sites in the coverage gap area at which a PWS tower can be built in compliance with the letter of the Zoning By-law. Although SCG followed up with the DPW repeatedly during the next several weeks, the Town issued no RFP for those sites.

## The Proposed PWS Facility at the Shops at Putterham

36.    During July 2002, having been unsuccessful in its efforts to get the Town to put the DPW Garage or Town Incinerator sites out to bid, with no other Town-owned site in the offing, and with no other feasible private alternative available, SCG identified and put forward as a candidate for filling the coverage gap a proposal to construct a rooftop site at the Property, which is also known as the "Shops at Putterham." The Property is a "strip mall" style shopping plaza that contains a variety of commercial uses. The Property is located immediately adjacent to the Francis X. Ryan Circle at the heart of the coverage gap. It is also located in a Local Business (0.5) Zoning District and contains no residential use. Verizon Wireless RF engineers tested the Property and determined that, with antennas mounted at a height of 53 feet above

ground level, this location could be used to close the extensive gap in Verizon Wireless signal coverage in the south part of Brookline. Given the locational constraints of the Zoning By-law, this is the only available and feasible location for a PWS facility to address that gap. Furthermore, installing a PWS facility at this location would be consistent with the stated purpose of Section 4.09 of the Zoning By-law "to encourage location of antennas on existing commercial buildings or structures rather than on residential ones or new towers."

37.     Verizon Wireless executed a lease for a portion of the interior and rooftop space at the Property and commenced the permitting process for the installation of a PWS facility. Section 4.09(6)(c) of the Zoning By-law provides that "a wireless telecommunications antenna and mount on a building or any related equipment, fixtures, or enclosures exceeding 10 feet above roof height, shall require in all districts a special permit issued by the Board of Appeals, subject to" the design review standards of the Zoning By-law pertaining to such facilities.

38.     On or about December 3, 2003, Verizon Wireless filed with the Brookline Town Clerk and the Board an application for a special permit to provide wireless telecommunications services at the Property. On or about that same day, Omnipoint Holdings, Inc. ("Omnipoint"), another PWS provider, also filed a permit application to provide wireless telecommunications services at the Property. The Board scheduled a hearing on these applications for February 12, 2004. On or about January 29, 2004, Verizon Wireless, along with representatives from Omnipoint, appeared before the Town of Brookline Planning Board ("Planning Board") to present their design proposals for the proposed PWS facility at the Property. At that session, members of the Planning Board made suggestions for improvements to the design of the proposed PWS facility. Based upon these suggestions, Verizon Wireless and Omnipoint

withdrew their special permit applications and continued to refine their design proposals, submitting further proposals to the Planning Board staff for review and informal comments.

39.     Verizon Wireless made every effort to minimize the visual impact of its installation at the Property, and worked closely with Omnipoint to ensure that the carriers' respective designs were visually compatible with one another, as well as responsive to comments made by Town planning staff and the Planning Board during the design review process. The initial proposal called for each carrier to place its antennas within one of two 40-foot high "flagpoles" to be located on the main roof of the building at the Property, behind each of the two existing cupolas. In a "flagpole" installation, three long narrow antennas are installed vertically around the inside of the flagpole, so that they are not visible from the outside. The diameter of the flagpole, and hence its apparent width when viewed from the ground, is dictated by the width and thickness of the antennas. The initial designs called for a flagpole that would be nearly three feet in diameter. The Planning Board, however, objected to the visual impact caused by the width of the flagpole and its location on the roof behind the cupola.

40.     As an alternative, the carriers proposed to construct a narrower cupola, 20 feet high, atop the existing cupola so that the antennas and equipment could be fully enclosed. Even though the resulting proposal was attractive and consistent with the design of the existing building, and even though the extended cupolas could be designed to completely hide the fact that PWS equipment was installed at the Property, the Town planning staff dismissed the revised proposal as objectionable because of its "massing."

41.     Based on the comments of the Planning Board and its staff, Verizon Wireless and Omnipoint made further revisions to the design of their PWS facilities at the Property. In response to the objections that had been raised by planning staff, Verizon Wireless searched for

14

and found the smallest available antenna – at least as small as, if not smaller than, any antenna it had ever used before in any similar installation in the Northeastern United States. With this antenna, Verizon Wireless could reduce the diameter of a proposed "flagpole" from nearly three feet to only 18 inches. Using this smaller diameter antenna, Verizon Wireless proposed a design for the installation of its PWS facility at the Property that would enclose its equipment completely within one of the existing cupolas located atop the building, and place its antennas completely within an 18-inch wide flagpole affixed to the building within the existing cupola. This flagpole would rise just 20 feet above the peak of the existing cupola to a total height above the ground of less than 53 feet and could, if desired by the Board as a way to help further camouflage the installation, fly the American flag. All of Verizon Wireless' equipment would be hidden within the cupola and connected to the antennas by wiring hidden within the flagpole. An emergency generator for Verizon Wireless' use in the event of a catastrophic power failure would be located atop the rear portion of the roof with the building's air conditioning condensers and ventilation equipment. A screening wall, designed to match the existing building façade, would hide the generator from the view of abutters and the public (collectively, "the Proposed PWS Facility"). Omnipoint proposed a nearly identical installation for the other cupola on the building, although without a generator.

42.    Town planning staff voiced the opinion that this design represented an improvement over previous proposals. Based on that view, as well as the fact that there were no specific recommendations for further design improvements that could reasonably be made while still providing a functional PWS facility at the Property, Verizon Wireless decided to proceed to seek Board approval of the Proposed PWS Facility.

## The Application, Hearing and Decision

43.     On or about June 17, 2004, Verizon Wireless filed an application with the Town

Clerk and the Board for a special permit under Sections 4.5, 5.09, and 9.5 of the Zoning By-law

to allow the Proposed Facility to be located on the existing building at the Property (the

"Application"). The Application included information demonstrating that the Proposed PWS

Facility satisfied all of the requirements for a special permit under the Zoning By-law and

M.G.L. c. 40A. Omnipoint also filed an application for a special permit to allow its proposed

PWS facility to be located on the Property.

44.     The Brookline Building Commissioner had not initially required that Verizon

Wireless seek approval under Section 5.09 of the Zoning Bylaw, which requires that certain uses

obtain a special permit for "community and environmental impact and design review." After the

project became politically controversial, however, he changed his mind and indicated that he

would require relief under that provision. But Section 5.09 should not apply to the addition of

the Proposed PWS Facility to the Property. That special permit is required for, among other

uses, a "non-residential use in a non-residential district with more than 10,000 square feet of

gross floor area." Because the Proposed PWS Facility use by both Verizon Wireless and

Omnipoint will take up far less than 10,000 square feet of gross floor area, the Building

Commissioner's requirement that Verizon Wireless seek relief under Section 5.09 of the Zoning

By-law was erroneous and contrary to law.

45.     On August 12, 2004, the Board opened a public hearing to consider the

Application (the "Hearing"). The hearing on the application by Omnipoint was conducted

simultaneously. At the Hearing, Verizon Wireless presented evidence in support of its

Application, but the hearing process was not completed on August 12, and was initially

16

continued to October 7, 2004, then postponed to October 28, 2004, and then delayed again until December 9, 2004. On December 9, 2004, the Board finally reconvened to hear the Application along with Omnipoint's application.

46.     At the Hearing, Verizon Wireless provided evidence demonstrating that its Proposed PWS Facility complied in all respects with the applicable requirements of the Zoning By-law and M.G.L. c. 40A. For example, Verizon Wireless presented testimony and other evidence that the Proposed PWS Facility would be located on a commercial building and would not be located within 50 feet of a residence or any of the other uses addressed by the setback restrictions in Section 4.09.6.a (1) through (3) of the Zoning By-law.

47.     Verizon Wireless also demonstrated that by containing its equipment (with the exception of the generator) inside the cupola, by camouflaging the antenna within a flagpole, and by locating the emergency generator next to existing rooftop equipment and behind a screening wall matching the building façade, it had made the installation "as unobtrusive as possible when viewed from the street and from upper floors of nearby residences" and had made "every effort . . . to have them blend in with the style and color of the building they are located upon and the surrounding environment and not negatively impact property values or environmentally sensitive areas such as wetlands or historic sites," all as required by Zoning By-law Section 4.09.7.1.

48.     Furthermore, Verizon Wireless established through the testimony of its radiofrequency engineer, Jared Robinson, that the proposed flagpole height of 20 feet above the existing height of the cupola roofs was necessary for the proper functioning of its antennas and that these antennas would fill the significant coverage gap.

49.     On March 3, 2005, the Board filed with the Town Clerk its Decision denying the Application and also denying Omnipoint's application as part of the same Decision. (*See* Exhibit

A.) The Board did not make separate findings pertaining to each of the two applications, but rather treated them as a single consolidated proposal.

50.    In the Decision, the Board made numerous findings and drew resulting conclusions that were contrary to the evidence as it pertained to Verizon Wireless' Proposed PWS Facility. For example, the Board made a finding that the Proposed PWS Facility will not "provide service to that section of South Brookline on the reverse side or other side of" the hill that rises up from the Property. The Board also justified its Decision by concluding, in part, that "the location of the proposed monopoles, at the bottom of a hill, . . . blocks coverage on the other side of the hill." There is no basis in the Zoning By-law for denying the Application on such a ground. Moreover, the only competent testimony as to Verizon Wireless on this issue at the Hearing was from the Verizon Wireless' RF engineer Jared Robinson's affidavit and testimony, as well as the coverage plots submitted with the Application. This evidence clearly demonstrates, as to Verizon Wireless, that it can close all of its existing coverage gap in the south part of Brookline with the Proposed PWS Facility at the Property, including any gap on the "other side of" the hill.

51.    Likewise, the Board based its Decision in part on its finding that other carriers not presently before the Board and their customers would not be served by the Proposed Facility at the Property. (Exhibit A, p. 7.) But there was no evidence that such carriers had sought to locate at the Property. Moreover, there is no provision in the Zoning By-law that would require wireless service providers to develop facilities for their competitors, or allow the failure to do so to be valid grounds for a special permit denial.

52.    Similarly, the Board reached its Decision to deny the Application in part on the legally untenable ground that the Town public safety departments use "another wireless service

18

provider." (Exhibit A, p. 7)  Yet, there was uncontroverted evidence at the hearing that the Town's police department has complained that it is unable to use its Verizon Wireless data system within the coverage gap.

53.    Furthermore, in its findings and throughout the Decision, the Board mischaracterized the Proposed PWS Facility as constituting a "monopole" installation within the meaning of the Zoning By-law.  Based on this mischaracterization, the Board concluded that the Proposed PWS Facility violated the "monopole setback and screening requirements" of the Zoning By-law.  (Exhibit A, p. 7.)  However, the Zoning By-law itself at Section 4.09.3(c) defines monopole as a pole that is "self-supporting with a single shaft."  By contrast, the proposed flagpoles would be supported by framing installed within the existing cupolas and would not be "self-supporting."

54.    The Board also concluded without any factual basis that Verizon Wireless had failed to "investigate several feasible alternatives on Town property."  (Exhibit A, p. 6.)  This is contrary to the long history of Verizon Wireless trying unsuccessfully to get the Town to make potentially suitable properties in the southern part of Brookline available for PWS use, and the Town's complete failure during that time to award any carrier or tower company a lease for PWS use at any Town-owned property.

55.    The Board made other generalized and unsupported factual findings that are contrary to the evidence.  Among other things, the Decision states as a "finding" that the flagpole will rise "40 feet above the roof of one building" (Exhibit A, p. 6.), when the plans filed with the Application clearly show that the highest point of the Proposed PWS Facility will be only 20 feet above the roof of the existing cupola upon which it sits. The Decision also states as a finding that the flagpole "will be illuminated throughout the night" (Exhibit A, p. 6.), even though the

19

record demonstrates that Verizon Wireless representatives at the Hearing stated that the proposed lighting was a function of federal regulations concerning the display of the American flag, that the facility would not need to be lighted at all if the American flag were not flown from it, and that Verizon Wireless was willing to have some other flag, such as the Town flag, flown instead.

### Further Efforts to Fill the Coverage Gap

56.    Even after it began the zoning process for the Proposed PWS Facility at the Property, Verizon Wireless continued to investigate and express interest in other sites on Town and private property that might have proven to be feasible alternatives to the Property.

#### Puddingstone Condominiums

57.    During April 2004, the owner of a multi-family development called Puddingstone Condominiums, located at Fairgreen Terrace, approached Verizon Wireless with a proposal to have Verizon Wireless site a PWS facility on its property.  SCG investigated this location, but concluded that a PWS facility there could not be permitted under the Zoning By-law because it would have required the construction of a tower in a residential district or the location of antennas on buildings containing dwelling units, both of which are prohibited under Section 4.09(a).

#### The Walnut Hills Cemetery Site

58.    In August 2004, the Town finally issued an RFP for the construction of a new tower on Town-owned land in south Brookline.  The Town has acknowledged that this RFP was conceived and put forward in reaction to the pressure on Town officials created by Verizon Wireless' pending application for a special permit, and as a way to identify and make available locations for a PWS facility that could address the increasing number of complaints the Town was receiving regarding the lack of cell phone coverage in south Brookline.  Verizon Wireless let

potential bidders know that it would be interested in locating on any facility that resulted from the RFP process if the Board rejected its pending Application for the Proposed PWS Facility at the Property.

59. The Town received competing bids from three wireless facility developers and two wireless carriers. Ultimately, the Town committee responsible for evaluating bid responses accepted only one bid for one property -- a bid by a tower developer to construct a "mono-pine" (monopole tower disguised as a pine tree) for the Walnut Hills Cemetery. Immediately upon the award of that bid, Verizon Wireless contacted the successful bidder to reiterate its interest in collocating on any resulting facility. A cell site at the Walnut Hills Cemetery would have substantially or completely addressed the existing coverage gap for Verizon Wireless in the south part of Brookline, assuming that Verizon Wireless was permitted to place its antennas high enough above ground level.

60. Verizon Wireless expressed interest in the Walnut Hills Cemetery site even though it had significant doubts as to whether a tower at that location could obtain the necessary approvals. The Walnut Hills Cemetery is located within an S-10 single family residential zone. It also is listed on the Massachusetts and National Registers of Historic Places. Notably, Section 4.09.6.a of the Zoning By-law prohibits wireless communications towers in a residential zone and prohibits wireless communications antennas and facilities from being located on or within 50 feet of any historical site. Although Section 4.09.2 of the Brookline Zoning By-law states that the provisions of Section 4.09 regulating wireless telecommunications shall not apply to "antennas to be located on Town-owned property," it does not provide that such exemption also applies to towers, which are separately defined in Section 4.09.3. For that reason, it is not even clear that a tower at the Walnut Hills Cemetery could be approved under the Zoning By-law. (It

21

likewise is not clear that a tower could lawfully be approved at any Town-owned site that is located within a residential zoning district.)

61.    In September 2004, an article ("Warrant Article 11") was placed on the warrant for the Fall 2004 Town Meeting calling for the Town to authorize the lease of a portion of the Walnut Hills Cemetery for a wireless telecommunications facility. Warrant Article 11 was portrayed in documents presented to the Town Meeting as, in part, a way to thwart the Verizon Wireless proposal for the Property by making an alternative site available. Before the Town Meeting convened that November, however, residents and others had raised significant questions as to numerous aspects of the bid and award process. These included concerns about the qualifications of the selected tower developer (who did not have prior experience developing wireless communications facilities), the fact that the chosen proposal did not represent the highest financial return to the Town, and the legal viability of the proposed site. One Planning Board member, who dissented from the proposal, was openly skeptical about the ability of a proposed Walnut Hills Cemetery tower to comply with zoning requirements. There were also objections to Warrant Article 11 based on the impact of a tower on the property's historic status and its sanctity as a cemetery.

62.    Rather than approve a lease for a PWS facility at Walnut Hills Cemetery as proposed in Warrant Article 11, the Town Meeting voted instead to refer the article to a newly created Moderator's Committee. Town Meeting charged this Committee with reviewing alternatives and reporting to the 2005 Annual Town Meeting on "immediately actionable recommendations of distinct and technically feasible options for the siting of equipment for [wireless communications purposes in south Brookline] to be included in one or more warrant articles presented at the 2005 Annual Town Meeting."

63.    In fact, the Moderator's Committee did not place a report on the warrant for the 2005 Annual Town Meeting, which will be held May 24, 2005, and it still has not made recommendations for how the Town should address the admitted need for wireless communications facilities in the south part of Brookline. As a result, rather than make a specific recommendation for how to solve the significant and longstanding PWS coverage gap in south Brookline, the warrant for the 2005 Annual Town Meeting again defers the question to a later Town Meeting.

Brandegee Mansion

64.    In March 2005, one week after the Board issued the Decision denying Verizon Wireless' application for approval at the Property, Town Planner Selkoe contacted a Verizon Wireless representative to suggest (for the first time) that Verizon Wireless investigate locating on the roof of the Brandegee Mansion. Brandegee Mansion was constructed in the 19th Century as the manor house of a private estate, and is now owned and operated by a private foundation. The Brandegee Estate is listed on the State and National Registers of Historic Places. The property is beyond the edge of the coverage gap, and is just on the Brookline side of the municipal boundary with Boston. In responding to the Planner's suggestion that it look at this site, Verizon Wireless learned that AT&T Wireless had placed antennas on the chimneys of the Brandegee Mansion pursuant to a June 2000 design review approval by the Brookline Planning Board. This approval was granted and installation undertaken notwithstanding the protected historic status of this property, which would appear to make the installation in violation of the Zoning By-law antenna siting provisions. In addition to this zoning constraint, which would appear to preclude the lawful use of this site by Verizon Wireless, this facility would not accommodate an additional rooftop installation without physical modifications to the exterior of

23

the historic structure, assuming that the property owner were even willing to allow such an installation.

65.     In sum, Verizon Wireless' long and ongoing effort to site a PWS facility to serve the coverage gap in south Brookline has revealed just one location from which the necessary coverage can be provided within the requirements and limitations of the Zoning By-law without a lease from the Town of Brookline.  The Town has persistently failed to authorize the lease of any Town-owned site from which coverage might be provided to south Brookline, despite repeated requests that it do so by Verizon Wireless and other carriers over a period of many years.  Indeed, during the time when the Application was pending before the Board, the Town Meeting rejected a proposal for a tower at a Town-owned site that Verizon Wireless could have used to fill its substantial coverage gap, even though the Town itself had solicited the proposal. Without the ability to lease Town land, the only feasible site is the Property.  It is situated at the heart of the coverage gap, satisfies the locational requirements of the Zoning By-law and has a willing landlord.  Yet, after more than a year of design and zoning review, during which Verizon Wireless significantly refined its proposed design in response to concerns expressed by Town planning staff, the Board denied the Application for the Proposed PWS Facility at the Property. This leaves Verizon Wireless with a significant coverage gap in south Brookline, and no further options for filling that gap.  As a result, the Town has effectively prohibited Verizon Wireless from providing service to this significant coverage gap in south Brookline.

### The Federal Telecommunications Act of 1996

66.     Pursuant to 47 U.S.C. § 332(c), entitled "NATIONAL WIRELESS TELECOMMUNICATIONS SITING POLICY",

(i) The regulation of the placement, construction and modification of personal wireless service facility by any State or local government or instrumentality thereof –

(II)        shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

*        *        *

(iii )    Any decision by a state or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

*        *        *

(v )    Any person adversely affected by any final action or failure to act by a state or local government or any instrumentality thereof that is inconsistent with this subparagraph may within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis.

47 U.S.C. § 332 (c) (7) (B).

67.    A primary purpose of the TCA was to rapidly increase competition in the

telecommunications industry.  The legislative history provides:

The managers on the part of the House and the Senate [intend] . . . to provide for a competitive, deregulatory, national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunication markets to competition.

H.R. Conf. Rep. No. 104-458, at 113 (1996).

68.    The legislative history of the TCA also provides as follows:

The conferees intend that the court to which a party appeals a decision under Section 332 (c) (7) (B) (v) may be the federal district court in which the facilities are located or a state court of competent jurisdiction, at the option of the party making the appeal, and that the courts act expeditiously in deciding such cases.

H.R. Conf. Rep. No. 104-458, at 208 (1996).

69.    Verizon Wireless is a personal wireless service provider as described in the TCA, is licensed by the FCC, and is therefore entitled to the protections of the TCA. The Application for a special permit pursuant to the Zoning By-law constitutes a request to construct a PWS facility, and is subject to the TCA.

### Count I
### (Violation of TCA for Prohibiting or Having the Effect of Prohibiting PWS)

70.    Plaintiffs' allegations contained in paragraphs 1 through 69 above are incorporated by reference as if fully set forth herein.

71.    The TCA states that the "regulation of the placement, construction and modification of personal wireless service facili[ties] by any state or local government or instrumentality thereof . . . (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

72.    Verizon Wireless experiences a significant coverage gap in the southern part of Brookline.

73.    The Town of Brookline, acting through its various boards, commissions and officials and by its Town Meeting, has consistently thwarted efforts to establish permanent PWS facilities at locations from which  it would be possible for Verizon Wireless to fill its significant coverage gap in south Brookline. In particular, the Town has repeatedly refused to lease Town-owned land or structures in south Brookline for PWS use. In addition, the Town has adopted and implemented a Zoning By-law that has the effect of precluding PWS use on nearly all privately-owned property in south Brookline.

74.    The Property was at the time the Application was filed and considered, and is today, the only available and feasible location at which Verizon Wireless could construct a PWS

facility to close the significant coverage gap that its customers experience in the southern part of Brookline.

75.     The Board's Decision denying the Proposed PWS Facility made clear that the Board rejected not simply the design of the Proposed PWS Facility, but also any use of the Property for a viable PWS facility, no matter what its design. The Board made no attempt to condition the proposal in a way that would have addressed design issues, but merely denied it outright. The record of the hearing and the Decision itself provide ample evidence that it would be fruitless for Verizon Wireless to "try again" at the Property.

76.     In the context of the aforementioned Zoning By-law requirements, and the long history of unsuccessful efforts by Verizon Wireless to find any other available and feasible site from which it can provide signal coverage to the southern part of Brookline, the effect of the Board's Decision denying the use of the only available and feasible site from which the existing significant coverage gap can be filled is to prohibit Verizon Wireless from providing personal wireless services to its customers, in violation of 47 USC §332 (c) (7) (B).

77.     Verizon Wireless has incurred damages as a result of this violation.

78.     In light of the foregoing, Verizon Wireless is entitled to a declaration that the Town and the Board have violated the TCA by effectively prohibiting Verizon Wireless from providing personal wireless services, and that the Board's denial of the Application violates the TCA. Verizon Wireless is further entitled to an order of mandamus directing the Board to grant the special permit and to its damages.

### Count II
### (Violation of TCA Because Denial Not Supported by Substantial Evidence)

79.     Plaintiffs' allegations contained in paragraphs 1 through 78 above are incorporated by reference as if fully set forth herein.

80.    The TCA requires that decisions to deny a request to "place, construct or modify" a personal wireless services facility, such as the one proposed by Verizon Wireless in the Application, must "be supported by substantial evidence contained in a written record." 47 U.S.C. § 332 (c) (7) (B) (iii).

81.    Defendants have the burden to produce substantial evidence in the written record supporting their denial of the Application. There is no competent and substantial evidence in the written record supporting the Board's denial of the Application in accordance with the applicable provisions of the Zoning By-law. No such evidence was presented at the Hearing or in the record before the Board. Indeed, the evidence is to the contrary in that the Board:

(i)    wrongly concluded that the Proposed PWS Facility would not close Verizon Wireless' coverage gap in the south part of Brookline when the only competent evidence demonstrated that it would;

(ii)    wrongly based its denial on the fact that customers of carriers in competition with Verizon Wireless would not be served by the Proposed PWS Facility, even though there is no basis in the law for basing a denial on such grounds;

(iii)    wrongly based its denial on the allegation that the Town public safety departments would not obtain service from the Proposed PWS Facility even though there is no basis in the law for basing a denial on such grounds, and even though that conclusion is contrary to the evidence at the hearing that the Brookline Police Department uses a Verizon Wireless data service that is affected by the coverage gap;

(iv)    wrongly concluded that Verizon Wireless is proposing a "monopole," and therefore wrongly based its denial in part on the alleged failure to satisfy standards that are applicable only to monopoles;

28

(v)    wrongly based its denial on the erroneous conclusion that Verizon

Wireless failed to investigate Town-owned properties, when Verizon Wireless and other wireless

providers have for a period of many years repeatedly asked the Town to lease Town-owned land

for a PWS facility that can fill the coverage gap and the Town has not done so;

(vi)    wrongly considered the application under the provisions of Section 5.09 of

the Zoning By-law, which are not applicable to this PWS facility use; and

(vii)    made various other factual findings contrary to the evidence.

82.    The Board's failure to support its Decision by "substantial evidence contained in a

written record" constitutes a violation of 47 U.S.C. §332 (c) (7) (B).

83.    Verizon Wireless has incurred damages as a result of this violation.

84.    The TCA vests this Court with authority to grant mandamus relief if such relief

would be warranted under the circumstances.

85.    In light of the foregoing, Verizon Wireless is entitled to a declaration that the

Board's failure to base its Decision to deny the Application on substantial evidence in a written

record violates the TCA.  Verizon Wireless is also entitled to an order of mandamus directing the

Board to approve the Application and to its damages.

## Count III
### (Violation of M.G.L. c. 40A §4, Zoning Uniformity)

86.    Plaintiffs' allegations contained in paragraphs 1 through 85 above are

incorporated by reference as if fully set forth herein.

87.    M.G.L. c. 40A, §4 provides that "any zoning ordinance or by-law which divides

cities and towns into districts shall be uniform within the district for each class or kind of

structures or uses permitted."  This provision prohibits a municipality from regulating a use

differently within a given district based solely on who owns the property on which it is proposed.

29

88.     The Brookline Zoning By-law provides different and more restrictive treatment for wireless telecommunications antennas proposed for privately-owned property than it does for such facilities on Town-owned property located within the same district. In particular, Section 4.09.2 of the Zoning By-law does not apply to "antennas to be located on Town-owned property" (with the exception of the procedural requirements in Section 4.09.4.c., which specifically pertain to Town-owned property). The effect of the exemption in Section 4.09.2 is that the dimensional and design requirements pertaining to antenna installations on private property in a particular district do not apply to antennas installed on Town-owned property in the same districts.

89.     Although Section 4.09.2 of the Zoning By-law does not by its terms also exempt "towers" located on Town-owned land from the location and design limitations of Section 4.09 of the Zoning By-law, the Town of Brookline and its officers and Boards appear to interpret this provision as doing so. For example, in 2004, the Town offered the residentially zoned and historically designated Walnut Hills Cemetery for bid as a site for tower development, notwithstanding the prohibition in the Zoning By-law against locating towers on residentially zoned property or historic sites. Under such an interpretation, the dimensional and design restrictions and requirements of the Zoning By-law pertaining to wireless communications towers on private property would not apply to a wireless communications tower constructed on Town-owned property in the same district.

90.     Verizon Wireless' efforts to site a PWS facility in south Brookline have been made considerably more difficult by the fact that potentially suitable privately-owned parcels have not been available for consideration as potential cell sites because of the restrictive provisions in Section 4.09 of the Zoning By-law that violate the uniformity requirements.

30

91.    Verizon Wireless is entitled to a declaration that to the extent that the Zoning By-law provisions applicable to antennas and towers on privately-owned property do not also apply on Town-owned land in the same zoning district, they violate the uniformity requirements of M.G.L. c. 40A, §4 and are invalid.

**WHEREFORE**, Plaintiffs Cellco Partnership d/b/a Verizon Wireless and Bell Atlantic Mobile of Massachusetts Corporation Ltd. d/b/a Verizon Wireless respectfully request the following relief:

1.    An expedited review of the matters set forth in this Complaint, as provided by the Telecommunications Act of 1996, Pub. L. 104-104, § 704, 110 Stat. 56, codified at 47 U.S.C. § 332(c);

2.    A declaration that the Board's denial of Verizon Wireless' Application for a special permit for the Proposed PWS Facility violated the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B) in that it was not based on substantial evidence in the written record;

3.    A declaration that the Town through its Zoning By-law and public policies, and through the denial of the Application by the Board, has effectively prohibited the provision of personal wireless services in violation of 47 U.S.C. §332 (c)(7)(B);

4.    A declaration that Section 4.09 of the Town Zoning By-law violates M.G.L. c. 40A, §4 to the extent that it regulates wireless communications facilities located on privately owned property more onerously than it does such facilities located on Town-owned property, and an order invalidating those provisions of Section 4.09 that restrict PWS facilities on privately-owned property but not those on Town-owned property;

5.     An order of mandamus directing the Town and the Board to issue the requested special permit and all necessary zoning approvals and relief allowing Verizon Wireless to construct and operate a PWS facility at the Property;

6.     An order granting Verizon Wireless damages caused by the Defendants' violation of Verizon Wireless' rights under the TCA; and

7.     Such further relief as the Court may deem appropriate and proper.

PLAINTIFFS,
CELLCO PARTNERSHIP d/b/a
VERIZON WIRELESS and BELL
ATLANTIC MOBILE OF
MASSACHUSETTS CORPORATION,
LTD. d/b/a VERIZON WIRELESS

By their Attorneys,

Michael S. Giaimo (BBO #552545)

Danielle Andrews Long (BBO #646981)
Robinson & Cole LLP
One Boston Place
Boston, MA  02108-4404
(617) 557-5900

Dated: 4/4/05

32



A TRUE COPY
ATTEST

**TOWN OF BROOKLINE**
**BOARD OF APPEALS**
**CONSOLIDATED APPEALS # 40002 AND 40003**

RECEIVED
TOWN OF BROOKLINE
TOWN CLERK

2005 MAR -3 P 7:50

**DECISION UPON APPLICATIONS FOR SPECIAL PERMITS**
**BY T-MOBILE AND VERIZON WIRELESS TO INSTALL**
**WIRELESS TELECOMMUNICATIONS ANTENNAS AND**
**ASSOCIATED EQUIPMENT ON THE PROPERTY KNOWN AND**
**NUMBERED AS 183 GROVE STREET, BROOKLINE, MASSACHUSETTS**

The Petitioners, T-Mobile and Verizon Wireless, filed applications, numbered

40002 and 40003, to install wireless communications antennas and associated equipment

on the property generally known as the Shops at Putterham, also known and numbered as

183-189 Grove Street and 1004-1022 West Roxbury Parkway, in Brookline,

Massachusetts (the Property), owned by Robert W. Basile, Trustee (the Owner). The two

applications were consolidated for hearing and decision purposes, by agreement of the

parties, at the suggestion of this Board. The first Hearing was held on August 12, 2004,

and substantial evidence and testimony was received but the Hearing process was not

completed. Notice for the August 12, 2004 Hearing was published on July 22, 2004 and

July 29, 2004, in the Brookline TAB, copies of said notice are attached hereto in Exhibit

A and made a part of this Decision. Notice of the Hearing was mailed to the Owner, the

Applicants and their attorneys, to the owners of properties deemed by the Board to be

affected as their names appear on the then most recent local real estate tax list, to the

Planning Board and to all others entitled, by law, to such notice. After several

postponements, additional notice for the December 9, 2004, consolidated Hearing was

published on November 25, 2004 and December 2, 2004, in the Brookline TAB, copies

of said notice are attached hereto in Exhibit B and made a part of this Decision. Notice

1

of the Hearing was mailed to the Owner, the Applicants and their attorneys, to the owners

of properties deemed by the Board to be affected as their names appear on the then most

recent local real estate tax list, to the Planning Board and to all others entitled, by law, to

such notice.

At the time and place specified in the notice, a Public Hearing was convened on

December 9, 2004. Present at the hearing were Diane R. Gordon, Chair, and Board

Members Bailey S. Silbert and Enid Starr, the three members who participated in the

earlier Hearing on August 12, 2004.


### A.    BACKGROUND

Ricardo M. Sousa, Esquire of Prince, Lobel, Glovsky & Tye, LLP appeared on

behalf of T-Mobile. John M. Moran, President of Alpine Advisory Services, appeared on

behalf of Verizon Wireless. Attorney Sousa and Mr. Moran made presentations for the

Applicants.  Anna Adkins, RF Engineer, testified for the Applicants.

At the hearing, Polly Selkoe, Chief Planner, distributed a memorandum from the

Planning Board dated July 22, 2004.  The memorandum was accepted by the Board.

Both Applicants are personal wireless service providers and are licensed by the

Federal Communications Commission to provide cellular telephone services to a

geographic area that includes the Town of Brookline.  Cellular telephones work by

transmitting a low power signal between a mobile telephone and a wireless

telecommunications facility, or "cell site."  A cell site consists of antennae, in these

Applications contained in a large monopole. As a caller moves out of the coverage range

of one cell, the signal is "handed off" from the cell site in one cell to the cell site of an

2

adjacent cell. For there to be continuous service, it is critical that the facilities within each

cell be located in accordance with radio frequency ("RF") principles, taking into account

overall network design. RF design must accommodate such features as the height of the

proposed antenna, topographical concerns, the geographic distance and direction of the

proposed facility to other facilities in the network, and customer demands for service.

There is currently a "coverage gap" in certain areas in Brookline, including South

Brookline and Chestnut Hill. The existence of a coverage gap means that there is

currently not enough signal strength to allow customers reliably to initiate or hold calls

when located within or traveling through these areas. Using the RF principles described

above, the Applicants' engineers determined that a facility located within South

Brookline would remedy some portion of the coverage gap. Testimony from residents

and others familiar with the topographical concerns, the geographic distances and

location of the proposed facilities established that the existing gaps in substantial sections

of South Brookline would not be remedied by the Applicants' proposed facilities.

Throughout the hearing process, a number of abutters to the proposed site and

other residents expressed opposition to the construction of the facility on the Property and

their concerns about the visibility of the monopoles, the attendant noise of the generator

and the flags themselves and their impact upon the contiguous residential neighborhoods.

Additionally, 300 residents submitted petitions expressing opposition to and citing the

negative visual and noise impact that the monopoles would have upon their

neighborhoods and nearby Town property.

Opposition to the Applications and the issuance of Special Permits is best summarized by the testimony of a neighbor, Alisa Jonas. During her testimony she stated that:

> [t]he reasons for my opposition to the Putterham proposal are the following: First, the location of the towers, whether [or not] Putterham is inadequate from a technical coverage perspective. Rather than being on the top of the hill, it's on the bottom of the hill. Thus, as confirmed to us by cell company representatives, those streets on the other side of that hill, for example, Walnut, Walnut Hill, Beverly, Rangeley, Wolcott will not get the coverage, since the hill will block the signals. An elevated location from which signals will not be blocked from traveling thus would be far superior.
>
> Second, even for those residents not blocked from coverage only those with Verizon and T-Mobile will benefit from improved reception, which leads to the third reason, the public safety aspect. The police and fire departments use Nextel for cell coverage, so the towers ... will do nothing to improve that communication.
>
> And the lack of coverage for both residents with cell phones from other cell companies, and for residents on the other side of Walnut Hill further makes this proposal an inadequate option for the purposes of improving public safety.
>
> Fourth, the Town's By-Laws for wireless communications states that a monopole tower is not permitted in a residential district. In this case we have the unusual situation where one building is zoned commercial, but all the land surrounding the building is residential. Thus for all intent and purposes, [these] monopole[s], while located on a building on commercial land, will essentially be in a residential district.
>
> Further, the purpose section of the bylaws state [that] the towers are prohibited where they may be incompatible with existing residential uses. To allow the placement of two monopoles on the one commercial building surrounded by a residential district thwarts the intent and purposes of the bylaws to prevent such monopoles to be imposed directly on residences.
>
> With South Street homes facing directly onto the building, they will bear the immediate brunt of this application ... . And what the neighbors will have to deal with, quite aside from potential health considerations, if there are any, is the generator noise from the Verizon monopole, as well as the view of lighted towers through the night, which is completely inappropriate for a residential neighborhood.
>
> Further, the visual aesthetic of having two tall poles on top of the building, that is only one floor tall is an out-of-scale and unattractive image.

4

The Verizon representative mentioned the monopole on the Fleet Bank, and I know there were some people in town who said, well, there's monopoles on the Fleet Bank ... why can't we have something like that at Putterham Circle.

I think that my nine-year-old daughter and two friends spoke eloquently to that point. We drove past the bank. I asked them what they thought of the monopole. They told me that they thought it looked okay. Then I asked [what] they would  think of two such monopoles on Putterham Shops, and they immediately said, Oh, that would look ridiculous. The building is much too small.

Sometimes it takes the clearheadedness of youth to see so easily what is  appropriate and what is not. And, in fact, Verizon representatives told us the ones at the Putterham Shops are even more massive than the one at the Fleet Bank.

There also appears to be a technical aspect of this proposal that is prohibited by the bylaws.  As I understand Section 2I, I think in the bylaws, the towers must be set back 60 feet from all boundaries of the site. It appears that at least one of the monopoles that's located on the cupola does not have the adequate setback. It appears to be at least conservatively nine feet short, which is inadequate technically and from a safety perspective.

Finally, the bylaws require that an explanation must be submitted to explain the process used in selecting the site and other alternatives explored.   The South Brookline Neighborhood Association Board of Directors asked the cell companies [the Applicants] why they did not [consider sites on] Town land ... [that are] potentially better [for the] siting of cell towers ... [than the Property].   They told us that they believed [that] the Town is not interested; that the idea of cell towers on Town land had been [rejected] by Town Meeting years before. And that since that time, the Town had not issued an RFP.

The times for cell phones have changed radically ... and the Town is actively pursuing an optimum location on Town land to be presented for a vote at the spring Town Meeting.

The bylaws state repeatedly that a monopole can only be approved if no other alternative is possible. When this proposal was initiated by the cell companies, they were not aware of these alternatives currently being considered.

For those reasons, I ask you not to approve this proposal when hopefully a better one will be presented to Town Meeting in the spring.

There were ten residents representing local neighborhood groups, and many individual residents who spoke in opposition to the proposals. One resident, a tenant of the Owner, spoke in favor of the Applications.

## B.    FINDINGS OF FACT

1.    T-Mobile and Verizon are licensed personal wireless providers;

2.    There is currently a "coverage gap" in South Brookline;

3.    The Property is located in South Brookline;

4.    The Applicants allege the proposed "cell site" will eliminate the "coverage gap" for this system;

5.    The proposed two monopoles to be installed on top of the existing one story building on the Property will not, because of their location at the bottom of the hill, provide service to that section of South Brookline on the reverse side or other side of that hill;

6.    The proposed two monopoles will affect the "coverage gap" for only those two providers and will not eliminate all of the "coverage gaps" for the Applicants;

7.    The size and location of the two monopoles will have more than a "minimum visual impact" upon both the small, confined business area known as the Shops at Putterham and the large surrounding residential neighborhoods. They rise over 52 feet above the ground and 40 feet above the roof of one building. Their diameter is 18 inches (much larger than a flag pole) and will be illuminated throughout the night;

8.    There are several feasible alternative sites, on Town owned property, that have not been investigated by the Applicants;

9.    The Applicants' representations that the Town is not interested in making Town land available as "cell sites" is contrary to the records of the Town;

10.    By unanimous vote of a November 16, 2004, Brookline Town Meeting, under Article 11 in the Warrant for that meeting, a copy of which is attached as Exhibit C, together with the official record for that Article, which the Board includes as Judicial Notice, the Town notes that it has, in the past, dealt constructively with cellular providers in the siting of antennas and will, in the future, commencing with a Moderator's Committee, find a timely solution to both the "coverage" and public safety services needed in South Brookline, including the use of Town property;

11.    The proposed monopoles cannot be screened and will have a profound impact upon the contiguous low-density residential districts;

12.    The Applicants did not investigate several feasible alternatives on Town property. A map that shows the large amount of Town owned land in South Brookline is

attached as <u>Exhibit D</u>.  The Applicants did not contact the Moderator's Committee, appointed under the unanimous vote adopted at the November 16, 2004 Town Meeting, that is working to provide a timely solution to improving wireless communication services in South Brookline;

13.    The Property is not an appropriate location for the proposed monopoles;

14.    The monopoles, as proposed, would adversely affect the neighborhood; and

15.    The Applicants' proposals do not solve, for their respective systems, for other "cell systems" or for the Town's public safety system, the coverage gap in South Brookline.

## C.    CONCLUSIONS

The location of the proposed monopoles, at the bottom of a hill, that blocks coverage on the other side of the hill; the lack of provisions for other wireless service providers; the lack of coverage for Brookline Public Safety Departments (using another wireless service provider); the lack of coverage for residents using other wireless service providers; the violation of monopole setback and screening requirements in the Brookline Zoning By-Law; and the unattractive image of two tall, large (in diameter) monopoles on the top of a one floor building in a small business district; and the Applicants' failure to investigate several feasible alternatives provide a reasonable basis to deny the Applications.

## DECISION

Based upon the foregoing, it is unanimously voted to DENY the Applicants'

Applications for Special Permits.

RECEIVED
TOWN OF BROOKLINE
TOWN CLERK

2005 MAR -3 PM 3 50

Unanimous Decision of
the Board of Appeals of the
Town of Brookline

Diane R. Gordon, Chair

Bailey S. Silbert

Enid Starr

A True Copy,
ATTEST:

Town Clerk

Dated: March 3, 2005

8



# TOWN OF BROOKLINE
# MASSACHUSETTS
# BOARD OF APPEALS

# NOTICE OF HEARING

Pursuant to M.G.L., C. 39, sections 23A & 23B, the Board of Appeals will conduct a public hearing to discuss the following case:

Petitioner:  BASILE ROBERT W TR / Verizon
Location of Premises:  183 GROVE ST BRKL
Date of Hearing: 08/12/2004
Time of Hearing: 07:00p.m.
Place of Hearing: Selectmen's Hearing Room

A public hearing will be held for a variance and/or a special permit from

1)       4.09; Wireless Telecommunications Services;
   4.09.6.c; Special Permit Required.
2)       5.09.2.h; Design Review; Special Permit Required.

Of the Zoning By-Law to
install Wireless Telecommunications
Antennas; an Associated Equipmanet
Room; Temporary Portable Emergency
Generator as necessary and other related accessory structures for "Verizon Wireless"

at   183 GROVE ST BRKL

Said Premise located in a
L-0.5                                          district.

*The Town of Brookline does not discriminate on the basis of disability in admission to, access to, or operations of its programs, services or activities.  Individuals who need auxiliary aids for effective communication in programs and services of the Town of Brookline are invited to make their needs known to the ADA Coordinator, Stephen Bressler, Town of Brookline, 11 Pierce Stret, Brookline, MA 02445. Telephone: (617) 730-2330; TDD (617)-730-2327.*

                    Diane R. Gordon
                    Harry Miller
                    Bailey Silbert

Publish:  07/22/2004, and 07/29/2004

RECEIVED TOWN OF BROOKLINE TOWN CLERK  2004 JUL 19  P 3: 15



### TOWN OF BROOKLINE
### MASSACHUSETTS
### BOARD OF APPEALS

## NOTICE OF HEARING

**Pursuant to M.G.L., C. 39, sections 23A & 23B, the Board of Appeals will conduct a public hearing to discuss the following case:**

Petitioner:  BASILE ROBERT W TR
Location of Premises:  **183 GROVE ST BRKL**
Date of Hearing: **08/12/2004**
Time of Hearing: **07:00p.m.**
Place of Hearing: **Selectmen's Hearing Room, 6th. Floor**

A public hearing will be held for a variance and/or a special permit
from

**4.09; Wireless Telecommunications Services;**
  **4.09.6.c; Special Permit Required.**
2)       **5.09.2.h; Design Review; Special Permit Required.**

Of the Zoning By-Law to
install Wireless Telecommunications
Antennas; an Associated Equipment
Room; and Emergency Generator and
other related accessory structures for

at    183 GROVE ST BRKL

Said Premise located in a
**L-0.5**                                    district.

*The Town of Brookline does not discriminate on the basis of disability in admission to, access to, or operations of its programs, services or activities. Individuals who need auxiliary aids for effective communication in programs and services of the Town of Brookline are invited to make their needs known to the ADA Coordinator, Stephen Bressler, Town of Brookline, 11 Pierce Stret, Brookline, MA 02445. Telephone: (617) 730-2330; TDD (617)-730-2327.*

                                      **Diane R. Gordon**
                                      **Harry Miller**
                                      **Bailey Silbert**

Publish:  **07/22/2004, and 07/29/2004**



# TOWN OF BROOKLINE
# MASSACHUSETTS
# BOARD OF APPEALS

# NOTICE OF HEARING

Pursuant to M.G.L., C. 39, sections 23A & 23B, the Board of Appeals will conduct a public hearing to discuss the following case:

Petitioner:  BASILE ROBERT W TR / Verizon
Location of Premises:  183 GROVE ST BRKL
Date of Hearing:  12/9/2004
Time of Hearing: **07:15 p.m.**
Place of Hearing: **Selectmen's Hearing Room**

A public hearing will be held for a variance and/or a special permit from

1)      **4.09; Wireless Telecommunications Services;**
  **4.09.6.c; Special Permit Required.**
2)      **5.09.2.h; Design Review; Special Permit Required.**

Of the Zoning By-Law to
install Wireless Telecommunications
Antennas; an Associated Equipmanet
Room; Temporary Portable Emergency
Generator as necessary and other related accessory structures for "Verizon Wireless"

at  **183 GROVE ST BRKL**

Said Premise located in a
**L-0.5**                                    district.

*The Town of Brookline does not discriminate on the basis of disability in admission to, access to, or operations of its programs, services or activities. Individuals who need auxiliary aids for effective communication in programs and services of the Town of Brookline are invited to make their needs known to the ADA Coordinator, Stephen Bressler, Town of Brookline, 11 Pierce Stret, Brookline, MA 02445. Telephone: (617) 730-2330; TDD (617)-730-2327.*

**Diane R. Gordon**
**Harry Miller**
**Bailey Silbert**

**Publish:**   11/25/2004 and 12/02/2004



**TOWN OF BROOKLINE
MASSACHUSETTS
BOARD OF APPEALS**

# NOTICE OF HEARING

Pursuant to M.G.L., C. 39, sections 23A & 23B, the Board of Appeals will conduct a public hearing to discuss the following case:

Petitioner: BASILE ROBERT W TR / T Mobile
Location of Premises: 183 GROVE ST BRKL
Date of Hearing: 12/9/2004
Time of Hearing: 7:15 p.m.
Place of Hearing: Selectmen's Hearing Room

A public hearing will be held for a variance and/or a special permit from

1)      4.09; Wireless Telecommunications Services;
4.09.6.c; Special Permit Required.
2)      5.09.2.h; Design Review; Special Permit Required.

Of the Zoning By-Law to
install Wireless Telecommunications
Antennas; an Associated Equipmanet
Room; Temporary Portable Emergency
Generator as necessary and other related
accessory structures for "T Mobile"
at   183 GROVE ST BRKL

Said Premise located in a
L-0.5

district.

*The Town of Brookline does not discriminate on the basis of disability in admission to, access to, or operations of its programs, services or activities. Individuals who need auxiliary aids for effective communication in programs and services of the Town of Brookline are invited to make their needs known to the ADA Coordinator, Stephen Bressler, Town of Brookline, 11 Pierce Stret, Brookline, MA 02445. Telephone: (617) 730-2330; TDD (617)-730-2327.*

Diane R. Gordon
Harry Miller
Bailey Silbert

Publish:   11/25/2004 and 12/02/2004

<u>ARTICLE 11</u>

<u>ELEVENTH ARTICLE</u>

To see if the town will authorize the Board of Selectmen to lease, for not more than ten years, upon such terms and conditions as the Board of Selectmen determines to be in the best interest of the town, a portion of the town-owned land known as the Walnut Hills Cemetery, to a company that will install and be responsible for the operation of a wireless telecommunications facility and related equipment to be used for wireless telecommunications, for an annual payment to the Town of not less than $50,000, or act on anything relative thereto.

## PLANNING BOARD REPORT AND RECOMMENDATION

The Planning Board (two to one) voted to recommend that if sanctity and historic issues related to the Walnut Hills Cemetery are resolved at Town Meeting, the Board would support FAVORABLE ACTION on Warrant Article XI, subject to safeguard conditions related to: noise, maintenance and long term appearance of the structures, fencing, landscaping (including size and type of plant material), access path (including width, location and paving material), and lighting.

The majority of the Planning Board believes that this proposal for Walnut Hills Cemetery is the lesser of two evils when weighing the aesthetic impact of this proposal versus the one for the Putterham Shopping Center and that this site would provide the best cell coverage for South Brookline. However, they felt that Town Meeting should decide the issues surrounding any impacts to the sanctity and historic nature of the cemetery. They acknowledged the feelings of those who are very opposed to the Putterham Shops location and expressed respect for those who have been involved in cell regulations in the Town since their inception.

Several good questions were raised during the hearing regarding how the tower and equipment would look and how their appearance would be maintained over time, and the Board requested that before Town Meeting, more graphic representations and more details about materials for screening, etc. should be provided. Additionally, the majority of the Board felt that their charge for the Planning Board with respect to cell towers has always been the aesthetic issue and not legal ones, and they noted that the approval process which requires approval by the Selectmen and Town Meeting is much more stringent than the Board of Appeals process. The process for this warrant article, while not perfect, has been good and has and will involve much public participation through the various committees, at least seven, who will vote on recommendations for this proposal at a public meeting or hearing.

The issue of a cell tower on Town-owned land is not new to Brookline. In 1999, Town Meeting discussed a proposal to locate a cell tower at the Putterham Meadows Golf Course. The proposal was ultimately rejected by Town Meeting. Below is a brief history of cell towers in Brookline:

- **1996** = Federal Telecommunications Act
- **May, 1997** = Town Meeting approval of a moratorium on antenna permits through November 26, 1997. (Article 16)
- **June, 1997 – October, 1997** = Antenna Zoning Sub-Committee, consisting of two Planning Board members and concerned citizens, worked to formulate a by-law.
- **November, 1997** = Town Meeting approval of the addition of a Wireless Communications section to the Town's Zoning By-Law. (Article 10. Article 11 was a citizen proposal that did not pass.)
- **January, 1999** = RFPs for a cell tower on Town-owned property is issued.
- **February – March, 1999** = RFP responses received and reviewed.
- **June, 1999** = Planning Board review of proposed 100' monopole at the Municipal Service Center (MSC).
- **July – August, 1999** = negotiations with Omnipoint for a monopole at the MSC.
- **September, 1999** = decision to postpone negotiating with Omnipoint until TM discusses proposal for "stealth" tower in the woods at the Putterham Meadows golf course.
- **November, 1999** = TM votes No Action on a "stealth" tower at the golf course (Article 11).

This past Spring, the Board discussed establishing a committee to explore long-term options regarding wireless technology, for a number of reasons:
- concerns raised by the Police and Fire Chiefs regarding the gaps in the wireless public safety network
- an increasing number of complaints received by the CIO regarding the lack of cell phone coverage in So. Brookline
- the possibility of taking advantage of "wi-fi", and
- future wireless applications for the schools and town departments.

At the same time, we began receiving numerous letters and emails from neighborhood residents objecting to the proposal for two cell towers at Putterham Circle. The residents did not want the towers located there - - as evidenced by the petition signed by more than 200 Brookline residents - - so they asked the Board at separate meetings in June to independently investigate potential locations that could address the issues.

The Board of Selectmen responded quickly by authorizing a competitive bid process. The Chief Procurement Officer then immediately convened a Selection Board to develop an RFP and review the responses to that RFP. Included in the Selection Board were four residents, three of whom are Town Meeting Members, and four Town Department Heads. Three of the Department Heads (Fire Chief, Recreation Director, and Commissioner of

A Moderator's Committee provides the Town the time necessary to review alternatives and have a warrant article on the Warrant for the 2005 Annual Town Meeting, if necessary. Therefore, the Board of Selectmen recommends FAVORABLE ACTION, by a vote of 4-0 taken on October 26, 2004, on the following vote:

   VOTED: To refer Article 11 to a Moderator's Committee for report to the 2005 Annual Town Meeting.

**ROLL CALL VOTE:**
Favorable Action
Geller
Hoy
Sher
Merrill

---------------

## ADVISORY COMMITTEE'S RECOMMENDATION

BACKGROUND
This article comes to us because of a lack of cellular communications coverage in South Brookline that has existed for some time. Recently however, concerns by the Town's Public Safety Services (a number of police communication capabilities are unavailable in S. Brookline), specific requests by large numbers of South Brookline residents, and an undesirable plan by a private developer to locate twin antennae towers atop the shops at Putterham Circle in very close proximity to homes, indicates it is time to comprehensively address this issue. The residents specifically asked the Town to find an alternate viable site on Town property to locate telecommunications antennas in the area.

After hearing from these residents, and listening to the concerns of the Police and Fire Chiefs, the Board of Selectmen authorized the Town's Chief Procurement Officer to convene a working committee of Town staff and citizens to issue and evaluate a public RFP [request for proposal] for siting a communication facility(s) on Town-owned property. The Committee issued the RFP specifying it consider all Town-owned properties with four examples given: the DPW garage, Fire House #6, the Putterham Golf Course, and the Walnut Hills Cemetery.

Cellular communication providers (Verizon, Cingular etc.) and telecommunication facility siting companies evaluated the South Brookline area through radio frequency testing and mapping. As a result of their testing, the area's natural topography and the specified goals in the RFP (achieve maximum coverage while minimizing negative neighborhood impacts, including disruption and visual aesthetics) three of the five RFP responses indicated the Walnut Hills Cemetery as the optimal choice. The first choice of the other two respondents was Putterham Golf Course.

stipulates a $50K annual base plus 15% of the five co-location charges with a 3% escalation in fees. This translates to approximately $700K to the Town over the term of the lease. This fee structure appears to be well within the range of the "going rate". While $700K is not an insignificant sum, the potential financial gain to the Town is not the prime motivator for siting telecommunications equipment on Town property. Rather, it's the issues of adequate coverage and community control.

<u>Site Sanctity, Process and Passion</u>
The process to determine a site was a direct response to the concerns of the Public Safety Chiefs and the public, and has been commendable in many ways. A working committee of staff and residents, using a public RFP process, was a thoughtful approach. It's a mechanism that requires the consideration of things other than simply money in evaluating proposals. Even so, the process has thus far been short and narrow.

The cemetery Trustees have, appropriately, taken a position pursuant to their role as guardians of the cemetery. They, and others, feel that siting a cell tower within the confines of a cemetery is a fundamental breech of the area's sanctity. Others maintain that it is *how* it's sited, not merely *that* it is sited there. Indeed, churches and cemeteries around the country have elected to install towers on their property. There is disagreement among both the laity and clergy on this sensitive issue. It is a very personal assessment, but bear in mind how deeply some hold these feelings.

The Preservation Commission also does not support this site. It points out that the Walnut Hills Cemetery is listed on the Register of National Historic Sites and that any move to put a cell tower here would trigger a Federal review process. They also feel that the monopine would tower over the cemetery like an ominous sentinel. Though it should be pointed out, that from most of the cemetery's rolling wooded grounds, the monopine would not be seen.

There are also the issues of the potential uses of the knoll and proximity of the proposed tower to the old receiving tomb. Currently the knoll is unused, and being rock ledge it is unsuitable for full body internments. It may be feasible to use it in some way for the internment for ash however. The receiving tomb is a low-slung handsome granite structure that is seldom used. The cemetery Master Plan specifically contemplates a possible future use of the tomb either as a crypt or reception center (currently attached to the caretaker's house). The Trustees have mentioned they may wish to place a columbarium and/or chapel in this area as well and that an adjacent tower would compromise the contemplative nature of those uses. The cemetery Trustees' landscape architects Walker/Kluesing Design Group states in a letter submitted by the Trustees the concept of a columbarium at this site "was not discussed in the Master Plan for the cemetery because it wasn't necessary to illustrate development beyond a 30-40 year time span". How long, or if, it may be until this area is needed is beyond the Committee to determine.

There are two points worth making relative to this however. First, the tower lease (by law) is for a maximum of ten years. After that, Town Meeting can have the lessee

November 16, 2004
Special Town Meeting
Article 11 – Supplement No. 1

---

## ARTICLE 11

---

## SELECTMEN'S RECOMMENDATION ON ARTICLE 11

While both the Selectmen and the Advisory Committee recommend that a Moderator's Committee should be established to deal with the issue of locating cell towers, different language was voted. Therefore, at its November 2 meeting, the Board of Selectmen reconsidered its vote under Article 11. The Board agrees that the Advisory Committee's recommended language provides the Moderator's Committee with more clear direction, so they recommend FAVORABLE ACTION by a vote of 5-0 on the Advisory Committee's vote, which is reprinted below.

VOTED:    Town Meeting, recognizing the need for a timely solution to improving wireless communication services in South Brookline, refers the issues of siting telecommunication facilities in the town to a Moderator's committee for study with a report of immediately actionable recommendations of distinct and technically feasible options for the siting of equipment for such purposes to be included in one or more warrant articles presented at the 2005 Annual Town Meeting.



BROOKLINE
GIS

"Mapping Our Community"
http://www.town.brookline.ma.us/gis

Map created by Brookline GIS on 02/28/2005 and map doc:
lib/arcgis/projects/towncouncil/townownedsouthbrookline.mxb

## Legend

Town Owned Properties

Building Footprints

Parcels

Town Boundary

Pavement Edges

# Town Owned Properties in South Brookline

LARZ ANDERSON PARK

WALNUT HILL CEMETERY

PUTTERHAM MEADOW GOLF COURSE

BAKER SCHOOL PLAYGROUND

D. BLAKELY HOAR SANCTUARY

DANE PARK

INCINERATOR LAND

LOST POND CONSERVATION AREA

NEWTON ST

1,000   500   0        1,000
                        Feet

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)  Cellco Partnership d/b/a Verizon Wireless, et al. v. Town of Brookline, Massachusetts, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   ☐ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ☒ II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
           740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.           for patent, trademark or copyright cases

   ☐ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
           315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
           380, 385, 450, 891.

   ☐ IV.   220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
           690, 810, 861-865, 870, 871, 875, 900.

   ☐ V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES ☐    NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

   YES ☐    NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES ☐    NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

   YES ☒    NO ☐

   A.   If yes, in which division do all of the non-governmental parties reside?

        Eastern Division ☒    Central Division ☐    Western Division ☐

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

   N/A

   YES ☐    NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  Michael S. Giaimo and Danielle Andrews Long

ADDRESS  Robinson & Cole LLP, One Boston Place, Boston, MA 02108

TELEPHONE NO.  (617) 557-5900

(CategoryForm.wpd - 2/15/05)

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Cellco Partnership d/b/a Verizon Wireless and Bell Atlantic Mobile of Massachusetts Corporation, LTD. d/b/a *

## DEFENDANTS
Town of Brookline, MA; Town of Brookline Board of Appeals, et al.

(b) County of Residence of First Listed Plaintiff  Foreign Partnership
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Norfolk
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

*Verizon Wireless

(c) Attorney's (Firm Name, Address, and Telephone Number)
Michael S. Giaimo and Danielle Andrews Long
Robinson & Cole LLP, One Boston Pl., Boston, MA 02108
617-557-5900

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☒ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
47 U.S.C. § 332
Brief description of cause:  Action for declaratory relief, injunctive relief, mandamus and damages based upon prohibition of wireless services, State law

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE
DOCKET NUMBER

DATE  4/4/05
SIGNATURE OF ATTORNEY OF RECORD  Danielle A. Long

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

claims pursuant to G.L. c. 40A.